**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

U.S. BANK NATIONAL ASSOCIATION, as
successor to WACHOVIA BANK,
NATIONAL ASSOCIATION,

      Interpleader
      Plaintiff,

   –against–

BARCLAYS BANK PLC and MORGAN
STANLEY CAPITAL SERVICES INC.,

      Interpleader
      Defendants.

Case No. 09-cv-462 (RMB) (RLE)

---

<u>**MSCS EXPERT WITNESS STATEMENT: JOHN COSTANGO**</u>

  I, John E. Costango, declare as follows, on personal knowledge:

  1.  I am a Managing Director at the GreensLedge Group LLC, a financial advisory firm. Quinn Emanuel retained me on behalf of its client Morgan Stanley Capital Services Inc. ("MSCS") to provide my expert opinion in the above-captioned matter. A true and correct copy of my expert report, which sets forth my opinions and conclusions in this matter, is attached as Exhibit 164 to this expert witness statement.

  2.  Quinn Emanuel has also asked me to review an expert report submitted by Ira Wagner (the "Wagner Report") as well as the transcript of Mr. Wagner's deposition in this case.[1] It is my opinion that the Wagner Report is flawed in many respects, five of which I will address in detail here: (1) Mr. Wagner cannot reconcile his reading of the contractual language with his admission that it is industry custom and practice for ratings downgrade provisions to provide for

---

[1] *See* Expert Report of Ira Wagner, April 5, 2010; Deposition Transcript of Ira Wagner, May 5, 2010 ("Wagner Tr.").

three options at the first downgrade trigger; (2) Mr. Wagner's reading of the ratings downgrade provisions leads to absurd results; (3) Mr. Wagner relies upon flawed logic to justify his opinion that collateral demand is not required; (4) Mr. Wagner's argument that Morgan Stanley failed to perform its contractual duties is based on incorrect factual assumptions; and (5) Mr. Wagner's statements about thresholds and curing have no basis in industry custom and practice.

**Part I:  Ratings Downgrade Provisions — Custom and Practice are Contrary to Mr. Wagner's Interpretation of the Contract.**

3.      Mr. Wagner and I agree that industry "standard" ratings downgrade provisions allow a CDS Counterparty to elect one of multiple options upon a first level downgrade.[2]  We further agree that, in our extensive mutual experience, we cannot recall a single transaction where the CDS Counterparty must take more than one action upon a first level downgrade.[3]  Mr. Wagner and I also agree that this custom and practice is consistent with the ratings agencies' stated requirements.[4]

4.      Mr. Wagner nonetheless interprets the downgrade provisions in the Schedule as requiring MSCS to take more than one action upon a first level downgrade — a position that is plainly at odds with our shared experience and the rating agency pronouncements. Notwithstanding this apparent contradiction, Mr. Wagner makes no effort to reconcile his interpretation with the well-established industry custom and practice.  Rather, while Mr. Wagner claims to be serving as an expert in market practice, he repeatedly attempts to provide a legal reading of the contract at issue that contradicts market practice.

---

[2] *See* Wagner Report at 11; Wagner Tr. 44-7; 64:4-66:15.

[3] *See* Wagner Tr. 64:4-66:15.

[4] *See* Wagner Report at 8, 11; Wagner Tr. 74:20-76:2.

**Part II:  Ratings Downgrade Provisions — Mr. Wagner's Interpretation of the Contract Leads to Absurd Results.**

5.      Mr. Wagner admits that Morgan Stanley had already tripped the first downgrade trigger as of the Tourmaline closing date and was thus subject to the first downgrade trigger requirements.[5]  His "post plus" interpretation of those requirements would lead to the absurd result that MSCS was required to both post collateral and either replace itself or find a guarantor other than its parent Morgan Stanley within a short period after closing.  Taking one of the latter two actions would be entirely inconsistent with the purpose of the transaction.  Mr. Wagner offers no explanation for: (1) why MSCS would close a transaction under terms that effectively negate the purpose of entering into the transaction in the first place; (2) why no party objected to Morgan Stanley's role as guarantor or MSCS's role as CDS counterparty at closing; or (3) why Barclays has not asserted that MSCS's failure to transfer or guarantee at closing is an ATE.  A far more reasonable interpretation, and the one that comports with market practice, is that MSCS had three options at the first downgrade level.

**Part III:  Despite Mr. Wagner's Flawed Logic,  Demand for Collateral  Is Required in the Tourmaline Deal.**

6.      Mr. Wagner concedes that standard practice in the industry is for demand to be served upon a counterparty such as MSCS before any collateral posting obligation accrues, as reflected in the CSA template.[6]  Indeed, demand was required in all the CDO transactions he could recall.[7]  Mr. Wagner nonetheless contends that Tourmaline is somehow different on the basis of three flawed arguments.

---

[5]  *See* Wagner Tr. 145:21-146:16.

[6]  *See* Wagner Tr. 149:5-18; 157:7-18.

[7]  *See* Wagner Tr. 157:7-18.

7.      First, Mr. Wagner admits that Part 1(f)(2) of the Schedule (that is, the ratings downgrade ATE provision) specifically states that collateral posting must be "in accordance with the CSA."[8] Despite the fact that CSA 3(a) expressly states that collateral is to be posted "upon demand," Mr. Wagner claims, without explanation, that the demand provision of the CSA is not incorporated into Part 1(f)(2) and that Part 1(f)(2) overrides or displaces the demand requirement.  In my experience, demand requirements are very important, and I would expect any contract provision intended to override a plainly stated demand requirement would make it unequivocally clear that it was doing so.  Mr. Wagner does not point to any such language but rather proceeds to pick and choose other CSA provisions that he claims are incorporated into the Schedule without explaining why the demand requirement is not similarly included or why an intent to override the demand requirement should be inferred from Part 1(f)(2).  Notably, he claims that the parties should refer to the CSA to ascertain "the amount of collateral, the types of eligible collateral, valuation procedures, and holding and using the collateral posted," but contends that the clear CSA language requiring that the Secured Party first demand the collateral should be ignored.[9]  Mr. Wagner provides no reasonable explanation for such selective incorporation of some requirements of the CSA, but not others.

8.      Second, Mr. Wagner argues that it is unreasonable to expect the Trustee to make demand for collateral on behalf of the CDO.  It is clear, however, that Indenture 12.6(f)(v) states that the Trustee "shall make a prompt demand," and relying on a Trustee to perform actions such as demand is common in my experience in transactions of this kind.  As CDOs like Tourmaline have no employees and cannot act on their own, Tourmaline specifically contracted with the

---

[8] *See* Wagner Report at 12; Wagner Tr. 86:25-87:9.

[9] *See* Wagner Report at 12-13.

4

Trustee to provide the service of making collateral demands.[10]  Erroneously, Mr. Wagner asserts

that requiring demand would somehow be impractical because noteholders would have to take it

upon themselves to instruct the Trustee to make demand.[11]  Mr. Wagner fails to explain why

noteholders would need to be involved in the issuance of demand when it is a non-discretionary

act that was specifically delegated to the Trustee.[12]   To use Mr. Wagner's own language,

collateral demand is a "ministerial" process,[13] and is well within the Trustee's capabilities and

consistent with other actions that the Trustee takes on behalf of the CDO without any

involvement of noteholders, such as the collection and disbursement of funds and determining

amounts due as CDS premium payments.

> 9.      Mr. Wagner also tries to create a false distinction between the ability of CDOs

and sophisticated financial institutions to make demand for collateral under derivatives.[14]  While

a CDO is not a sophisticated financial institution, this is addressed in the Tourmaline transaction

through its contracting with the Trustee — which *is* a sophisticated financial institution — to

demand collateral on the CDO's behalf.  Furthermore, Mr. Wagner's suggestion that waiving

demand would somehow eliminate the necessity for action by the Trustee is false.  Rather, even

if the parties had waived the demand requirement, the Trustee would still need to take the

affirmative action of declaring an Additional Termination Event ("ATE") on behalf of the CDO

---

[10]  *See* Indenture 12.6(f)(v).

[11]  *See*, for example, Wagner Report at 5-6.  This argument even contradicts the specific facts of this case.  Barclays, in its capacity as the owner of certain senior notes, actually did direct the Trustee to take certain discretionary actions.  So even if such direction is required for the Trustee to make requisite collateral demand, which it is not, Barclays could have done so in this case.

[12]  Although Mr. Wagner attempts to characterize demand as some type of "dispute," demand for collateral is simply the first step of the process under which collateral gets posted.

[13]  *See* Wagner Report at 6.

[14]  *See* Wagner Report at 5-6.

if collateral was not posted in accordance with the contractual terms. Mr. Wagner does not explain how the Trustee could make such a subjective and significant discretionary decision as declaring an ATE while, at the same time, not being capable of the "ministerial" act of making a collateral demand.

10. Third, Mr. Wagner argues that, under Part 1(f)(2), demand must be "self-executing" because, without a demand waiver, investors would not receive the counterparty risk protection the downgrade provisions are meant to provide.[15] But noteholders do not rely exclusively on ratings downgrade provisions for this purpose, as Mr. Wagner implies. Just as the noteholders rely on the Trustee, who has a fiduciary duty to them, to secure the collateral accounts, follow the procedures in the CSA and otherwise perform its duties, the noteholders should be able to reasonably expect that the Trustee will perform the duties it has accepted under the Indenture with respect to collateral demand. The conclusion that Tourmaline's ratings downgrade provisions must implicitly waive the demand requirement for the downgrade provisions to be effective would only make sense if it was assumed that the Trustee would not fulfill its fiduciary duties to the Noteholders, an assumption under which investors would likely not invest at all. Furthermore, Mr. Wagner ignores the fact that even under his reading Part 1(f)(2) is not fully "self-executing" because the declaration of an ATE under Part 1(f)(2) is not automatic, and still requires someone to take action.

**Part IV: MSCS Did Not Frustrate the Trustee's Ability to Serve Demand.**

11. Mr. Wagner mistakenly argues that MSCS frustrated the Trustee's ability to make demand. For example, Mr. Wagner states that the collateral demand requirement "was to be triggered by Morgan Stanley's provision of the notice of downgrade...[which] they failed to

---

[15] *See* Wagner Tr. 101:5-22.

provide."[16]  This is completely at odds with Mr. Wagner's position that demand was waived, because if the Trustee had no obligation to make demand, the parties would have had no reason to include a requirement for MSCS to provide notice of ratings changes that affect the collateral posting requirement.  Moreover, Mr. Wagner argues that MSCS was required to provide notice of ratings downgrades specified in Part 1(f)(2), but fails to justify that conclusion by reference to the specific language in the CSA.[17]  A review of the Indenture shows that the Trustee accepted the duty to demand collateral, and that the parties included language that the Trustee would be told of any changes to Morgan Stanley's ratings that changed the collateral posting requirements under the CSA.[18]  As detailed in my expert report, no such downgrade occurred.[19]

12.     Mr. Wagner also erroneously contends that, as Valuation Agent, MSCS had a duty to calculate and notify the Trustee of "collateral amounts" potentially due to be posted.[20]  Mr. Wagner fails, however, to consider CSA 4(c), which does not refer generally to "collateral amounts" (i.e., the Credit Support Amount).[21]  Instead, CSA 4(c) states that the Valuation Agent will notify each party of its calculations of "Value" and "Exposure,"  which are components of the Delivery Amount that are subject to market adjustments.  Mr. Wagner's argument regarding MSCS's role as Valuation Agent is a red herring because the Trustee does not need to know the

---

[16]  *See* Wagner Report at 14.

[17]  *See* Wagner Tr. 89:2-96:25.  As I substantiate in my expert report (Part III-A), Morgan Stanley experienced no ratings downgrades between September 29, 2005 through January 9, 2009 which changed the potential collateral demand.  I reject Wagner's assertion that the language in Part 1(f)(2) of the *Schedule* referring to the allowable time to post collateral after a demand is itself a change "that would affect the then current collateral posting requirements as set forth in the *Credit Support Annex*" as Wagner cites in his report on page 17, emphasis added.

[18]  Indenture 12.6(f)(v).

[19]  *See* Costango Report at 9-10.

[20]  *See* Wagner Report at 14.

[21]  The relevant components of the Credit Support Amount are (1) future premium amounts and (2) potential Reimbursement Amounts.  CSA 3(b); 13(b)(iv)(A).

precise "Exposure" or "Value" amounts in order to demand collateral.  In particular, "Exposure" is the mark-to-market value of MSCS's total potential exposure under the CDS Agreement, which MSCS may have to post to Tourmaline if Morgan Stanley's credit ratings deteriorated below A-2(S&P)/P-2(Moody's).[22]  Here, "Exposure" was always zero because Morgan Stanley was never downgraded below these ratings thresholds.[23]  "Value" in this context refers to the value of the non-cash collateral posted to the deal, which is a function of certain haircuts expressly provided for in the agreements.[24]

13.      Furthermore, Mr. Wagner cannot conclude that the Trustee is ill-suited to calculate the Credit Support Amount in the absence of this notification.  Mr. Wagner implies that the Trustee needs to rely upon the Valuation Agent to calculate the Credit Support Amount, but elsewhere completely undermines this argument by admitting that the calculation required to determine these amounts is "the sum of more objective calculations" that are known to the Trustee.[25]  In its capacity as the Portfolio Administrator, the Trustee maintains the books and records of Tourmaline and therefore has ready access to both the future premium amounts and the Reimbursement Amounts that comprise the potential collateral posting amount.  As a result, the Trustee was well-suited (and arguably better-suited than any other party) to perform the calculation in order to fulfill its duty to demand collateral.

14.      Finally, Mr. Wagner incorrectly implies that the penalty for MSCS's alleged failure to perform its duties with respect to downgrade notices or collateral valuation would itself have provided the basis for an ATE.  He offers no support for this conclusion, either from his

---

[22]  CSA 12; 13(b)(iv)(C).

[23]  CSA 13(b)(iv)(C); Costango Report at 9.

[24]  CSA 12.

[25]  *See* Wagner Report at 5.

interpretation of the contracts or from his experience in the industry.  In any event, "Breach of Agreement" is turned off in the Tourmaline Schedule, which in my experience means that simple breaches of the CDS Agreement will not give rise to a termination event.[26]

**Part V:  Wagner's Statements About Relevant Downgrade Dates and Cure Have No Basis in Industry Custom and Practice.**

15.    The Wagner Report states that June 2, 2008, October 10, 2008 and December 17, 2008 were all relevant downgrade dates triggering MSCS's obligations to take certain actions under the ratings downgrade provisions.[27]  As I explain in Part IV of this expert statement, above, Mr. Wagner is incorrect in his belief that these are the dates on which MSCS was required to give any notice of a ratings change to the Trustee.  I also disagree that the December 17, 2008 date (the date that Morgan Stanley's Moody's long-term credit rating was downgraded from A1 (on watch for downgrade) to A2) is of any importance in this matter because it was not a date on which Morgan Stanley's ratings crossed a relevant threshold.  In my experience, the parties negotiate the ratings thresholds on which action must be taken. Had the parties to the Tourmaline deal wanted MSCS to take action if Morgan Stanley's rating went from A1 (on watch for downgrade) to A2, the parties would have negotiated a specific threshold contemplating that scenario.  However, the parties did not include such a requirement and thus, the December 17, 2008 downgrade is of no moment.

16.    One of Mr. Wagner's key assertions as to why MSCS's collateral posting of approximately $7 million on December 30, 2008 was somehow insufficient to meet its obligations is because, according to Mr. Wagner, MSCS was obligated to post collateral in the

---

[26]   Schedule 1(c)(ii).

[27]   *See* Wagner Report at 17.

total amount of approximately $12 million as of the termination date ten days later.[28]  Mr. Wagner's argument is contrary to both the deal documents and market practice.  Under his interpretation, a counterparty would always face the threat of termination unless it had posted collateral every single day, without warning that the amount had changed and without a reasonable amount of time to post.  In this case, the amount Mr. Wagner contends MSCS was required to post on the termination date had increased on that very day.  I cannot understand how any party could suffer an ATE for failing to post an amount that had just gone up that same day, especially considering Mr. Wagner's opinion that MSCS was not entitled to receive a demand for that collateral.

**Further Opinions**

17.      The explanation of my opinions contained in this statement is based upon the information available to me at this time.  If I become aware of facts, evidence and/or other information not available to me at this time, I reserve the right to supplement and/or revise this statement and revise my conclusions if warranted.

I reserve the right to amend this statement to the fullest extent allowable under applicable law.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 15, 2010

By:  _____
         John E. Costango
         Managing Partner
         The GreensLedge Group LLC

---

[28]  *See* Wagner Report at 15, 18.

# TRIAL
# EXHIBIT 164

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

U.S. BANK NATIONAL ASSOCIATION, as
successor to WACHOVIA BANK,
NATIONAL ASSOCIATION,

                    Interpleader
                    Plaintiff,

   -against-

BARCLAYS BANK PLC and MORGAN
STANLEY CAPITAL SERVICES, INC.,

                    Interpleader
                    Defendants.

Case No. 09-cv-462 (RMB)(RLE)

**Expert Report**
**by**
**John E. Costango**
**December 14, 2009**



HIGHLY CONFIDENTIAL

### Expert Report of John E. Costango

I, John E. Costango, am a Managing Director at the GreensLedge Group LLC ("GreensLedge"), a financial advisory firm founded in 2008. Quinn Emanuel Urquhart Oliver & Hedges, LLP ("Quinn Emanuel") retained GreensLedge so that I could serve as an expert witness in the above captioned matter. My compensation for my work is based on my normal billing rates which vary between $700 and $900 per hour. My compensation is not conditioned on the outcome of this matter. I have not testified as an expert in the past five years.

Quinn Emanuel asked me on behalf of its client Morgan Stanley to provide my expert opinion regarding custom and practice in the structured finance industry concerning certain collateral posting practices and their application to a specific ABS CDO transaction known as Tourmaline I CDO Ltd ("Tourmaline"). I am basing my opinion on my expertise as a practitioner in the ABS CDO and derivative markets and my extensive banking and structuring experience.

My experience in structured finance began in 2000. In the intervening years in my professional capacity, I have invested in and structured transactions with a wide variety of risks primarily related to mortgage or other asset-backed securitized risks. These transactions have included cash, synthetic and hybrid CDOs, financial guarantee insurance and reinsurance products, and single name credit derivatives. I hold Series 7 and 63 registration from FINRA as a Registered Representative.

At GreensLedge, I am actively involved in a variety of structured finance advisory assignments both as an expert consultant for structured finance disputes and bankruptcy/workout situations and as an advisor to investors and asset managers who are active in the structured products market.

Prior to joining GreensLedge, I spent two years as an Executive Director at J.P. Morgan Securities Inc. ("JPMorgan") where I served as JPMorgan's lead structuring banker for several large initiatives undertaken during the recent "credit crunch." In the fall of 2007 I led JPMorgan's structuring team for the $50 billion Master Liquidity Enhancement Conduit ("M-LEC"), arranged by US Treasury as a private sector solution to turmoil in the Structured Investment Vehicle ("SIV") market. In the spring of 2008, I led the team for JPMorgan in negotiations with the Federal Reserve Bank of New York to set up Maiden Lane LLC, the $30 billion facility funded by JPMorgan and the Federal Reserve Bank of New York in conjunction with JPMorgan's purchase of the Bear Stearns Companies Inc. Furthermore, at JPMorgan I served as the primary point of contact for the general counsel's office dealing with potential and actual CDO-related disputes.

During the three years starting in February 2004, I was a Director with Citigroup Global Markets Inc. ("Citigroup") as a structurer and deal manager in the ABS CDO group. In that capacity I was the primary point of contact at Citigroup for development of documentation and procurement of ratings for every transaction I led and had an ongoing dialogue with investors and asset managers as part of the deal marketing process. During that time I led the structuring for every type of ABS CDO transaction being brought to market, including high grade and mezzanine ABS

HIGHLY CONFIDENTIAL

CDOs (cash, synthetic and hybrid) and commercial real estate CDOs. Because of my experience I am very familiar with hybrid, mezzanine, ABS CDO structures like Tourmaline.

My resume is attached as Exhibit A to this expert report. A list of documents upon which I relied when writing this expert report is attached as Exhibit B.

This report is in five parts. In the first part, I introduce the Tourmaline transaction by listing the various parties involved in Tourmaline's formation, describing generally how transactions of this type work, and outlining Morgan Stanley's and Barclays' ongoing roles in the transaction. Then, in the second part, I outline my understanding of the pending dispute between Morgan Stanley and Barclays. In the final three parts, I provide my expert opinion concerning industry custom and practice on the following topics:

    (A)    Collateral posting obligations for CDS counterparties facing CDOs;

    (B)    Credit ratings downgrade triggers affecting CDS counterparty obligations; and,

    (C)    Ability of CDS counterparties to cure certain additional termination events

## Part I: Introduction

Tourmaline is an ABS CDO designed to take exposure to approximately $750 million of asset-backed securities and other debt, including subprime residential mortgages and other CDOs. U.S. Bank National Association (the "Trustee") is the trustee under the note indenture as well as the administrator for the assets in Tourmaline's portfolio.[1] As portfolio manager, BlackRock Financial Management, Inc. ("BlackRock") provides advisory services related to asset selection, risk management and disposition. Morgan Stanley & Co. Incorporated and Barclays Capital were co-structuring agents. As sole bookrunner, Morgan Stanley affiliates marketed the transaction's rated notes to investors. Tourmaline closed on September 29, 2005 and is still in existence.

Tourmaline is what is commonly referred to in the industry as a "hybrid" ABS CDO and has many typical characteristics which are very familiar to me. It is known as a "hybrid" because it has characteristics of both cash and synthetic CDO transactions. Specifically, its asset pool contains both cash and synthetic assets and the capital structure contains both funded and unfunded liabilities. Cash assets are securities such as loans or bonds which Tourmaline purchases by paying the purchase price to a seller and are held by the Trustee for the benefit of the Tourmaline secured parties. Synthetic assets are derivative instruments through which Tourmaline takes exposure to certain reference obligations (typically asset-backed securities of various types) through a credit default swap ("CDS").

In Tourmaline, the synthetic assets take the form of CDS between Tourmaline and a counterparty or counterparties where Tourmaline is the "seller of protection" and the

---

[1] At closing, Wachovia Bank, National Association assumed the roles of trustee and portfolio administrator for Tourmaline. Subsequent to closing, U.S. Bank National Association took over both roles. In this report I will refer to U.S. Bank National Association as the "Trustee" in both capacities.

HIGHLY CONFIDENTIAL

counterparty is a "buyer of protection."  Under the terms of the CDS, to the extent that certain credit events occur, reflecting deterioration with respect to the reference obligation, Tourmaline will make payments to the counterparty referred to as "Floating Amount Payments." The reference obligations for the CDS in Tourmaline's portfolio are asset-backed securities (such as residential mortgage backed securities, including subprime RMBS).[2]  In exchange for this protection on the reference obligations, the counterparty as buyer of the protection agrees to pay Tourmaline a periodic payment amount, commonly referred to as "CDS Premium," and also agrees to reimburse Tourmaline for certain payment amounts previously made to it by Tourmaline to the extent that the reference obligation improves in credit quality.  The specific terms of the CDS contracts are set forth in a standard confirmation (the "CDS Confirmation") known in the industry as the "Pay-as-You-Go" CDS on ABS or CDS on CDO confirmation.

Synthetic assets can be either Funded Synthetic Assets or Unfunded Synthetic Assets.  Under the terms of a Funded Synthetic Asset, Tourmaline will set aside, in a segregated sub-account at the Trustee, cash or cash equivalents equal to 100% of the possible protection payments it could be required to make to the counterparty.  Thus the counterparty to a Funded Synthetic Asset (known in Tourmaline as a "Funded CDS Counterparty") knows that Tourmaline will be able to make good on any claims under the CDS.

With an Unfunded Synthetic Asset, the counterparty (known in Tourmaline as an "Unfunded CDS Counterparty") does not have the benefit of cash or cash equivalents set aside for it in a segregated sub-account at the Trustee. Instead, the counterparty is a secured party under Tourmaline's Indenture[3] and sits near the top of the cashflow waterfall to receive payments due to it.[4] Furthermore, at closing Tourmaline entered into a liquidity arrangement with a liquidity provider who has agreed to provide funds to Tourmaline to meet its payment obligations under any Unfunded Synthetic Assets.[5]  Relying upon Tourmaline's ability to turn to the liquidity provider for funds, the Unfunded CDS Counterparty would typically view Tourmaline as a "good counterparty" that can make good on its promises of protection payments under the CDS if required.[6]

In addition to Morgan Stanley's roles at closing as "co-structuring agent" and "sole bookrunner" of Tourmaline notes, Morgan Stanley Capital Services, Inc. ("MSCS"), an affiliate of Morgan Stanley, also acts in an ongoing capacity as the Initial Unfunded Synthetic Asset Counterparty and as a Funded Synthetic Asset Counterparty, as those roles are defined in the Indenture.  For the purposes of this expert report, MSCS will be referred to as the "CDS Counterparty" in its capacity as the Initial Unfunded CDS Counterparty. Six documents define this arrangement: an ISDA Master Agreement, Schedule, Credit Support Annex (to the

---

[2] See Schedule A to the Initial Unfunded Synthetic Asset Confirmation.
[3] See Indenture, definition of "Secured Parties."
[4] See Indenture, Section 11.1(a)(i)(4)(4)(A) and Section 11.1(a)(ii)(1)(A).
[5] See Section 2.02 of the Liquidity Agreement, "Use of Proceeds."
[6] This statement assumes that the Liquidity Agreement is appropriately structured and that the liquidity provider is creditworthy.

HIGHLY CONFIDENTIAL

Schedule), the trade confirmations (which are documented in two agreements but should be read as being many confirmations, one for each reference obligation) and a guarantee from Morgan Stanley guaranteeing MSCS's obligations under the CDS Agreements.[7] Since MSCS is entitled to funds from Tourmaline in the event of poor performance on the Tourmaline collateral pool, we can think of MSCS as being "short" the risk of the collateral pool (including subprime RMBS and CDOs) and as therefore being entitled to receive payments from Tourmaline upon the occurrence of certain events related to deterioration in the credit quality of those assets. It should be noted that it was commonplace in the market in 2005 and 2006 for a party in MSCS's position to be an intermediary with respect to the CDS Agreements such that they entered into trades with customers where they were sellers of protection on the same reference obligations in the CDO collateral pool.

Barclays Bank Plc ("Barclays") has two ongoing roles with Tourmaline. Barclays is a Funded CDS Counterparty with respect to a subset of the Funded Synthetic Assets in the Tourmaline collateral pool where Barclays acts as a buyer of protection. Barclays' more financially significant role, however, is that of liquidity provider to Tourmaline, whereby Barclays entered into commitments to provide Tourmaline with up to $487.5 million of cash in the event that Tourmaline needed to make payments on any Unfunded Synthetic Assets.[8] Since Barclays has agreed to advance funds to make payments due to poor performance on the Tourmaline collateral pool, we can think of Barclays as being "long" the risk of the collateral pool (including subprime RMBS and CDOs) and therefore significantly exposed to deterioration in the credit quality of those assets.

Because MSCS is "short" the Tourmaline collateral pool and Barclays is "long" the Tourmaline collateral pool, MSCS and Barclays are economically adverse to each other in this structure.

## Part II: Subject of the Dispute

I am aware that there is a pending dispute between MSCS and Barclays related to Tourmaline. I am aware the dispute arose after the Trustee sent a termination notice to MSCS in MSCS's capacity as an Unfunded CDS Counterparty on January 9, 2009. I understand that the Trustee sent this notice at the direction of Barclays and that the Trustee issued the termination notice on the basis of Barclays' contention that one or more Additional Termination Events ("ATEs") had occurred under the Unfunded Synthetic Asset documentation (the "CDS Agreement"). I am aware that in a letter dated January 12, 2009, MSCS told the Trustee that, in fact, no ATE had occurred and thus the termination notice was without merit. Subsequent to MSCS's objection, the Trustee was unable to resolve the differences between Barclays' and MSCS's positions on

[7] The guarantee is attached to the Schedule and referenced in the Schedule Part 4(j)(i) as a Credit Support Document for MSCS.
[8] Barclays and Tourmaline executed the Liquidity Facility Agreement (the "Liquidity Agreement") on September 29, 2005.

HIGHLY CONFIDENTIAL

the matter and as a result, the Trustee filed an interpleador action (the "Complaint") against MSCS and Barclays in the United States District Court for the Southern District of New York.[9]

According to the notice sent to MSCS by the Trustee on January, 9, 2009, an ATE referenced in the Schedule Part 1(f)(2) and part 5(s)(ii) had occurred. Although the notice did not elaborate, the ATE referenced in these sections relates to take certain required actions following certain ratings downgrades. Such a termination could have significant economic implications for Tourmaline, its investors, and its counterparties, including MSCS and Barclays.

According to the Trustee's Complaint, "[t]he question of whether the Initial Unfunded CDS Agreement ... is terminated directly impacts the payments to be made under the Indenture."[10] Specifically, according to the Trustee,[11] the consequences of this termination would be that termination payments owed to MSCS under Part 1(d)(ii) of the Schedule would only be payable to MSCS to the extent that available funds remain after paying certain other obligations, including all monies owed to Barclays and the holders of the Tourmaline rated notes.[12]  In other words, MSCS would, following this ATE, occupy a "bottom of the waterfall" payment position. This "bottom of the waterfall" payment position contrasts to the "top of the waterfall" payment position normally enjoyed by MSCS for the majority of payments, including termination payments when MSCS is not the "Defaulting Party" or (as in this hypothetical case) an Affected Party. The subordination of MSCS from the "top of the waterfall" to the "bottom of the waterfall" implies a significant shift in its position and means, in all likelihood, that Morgan Stanley would receive much less in credit protection payments from Tourmaline than it would otherwise receive if not subordinated. The clear primary beneficiary of this subordination would be Barclays.[13]

### Part III: Collateral posting obligations for CDS counterparties facing CDOs

I have been asked to provide an expert opinion with respect to industry custom and practice surrounding collateral posting by CDS counterparties to CDOs and to apply such custom and practice to the specific facts and circumstances surrounding Tourmaline as I understand them. My opinion is based on my years of experience structuring CDO transactions that incorporate

---

[9] Case No. 09-cv-462 (GBD).  U.S. BANK NATIONAL ASSOCIATION, as successor to WACHOVIA BANK, NATIONAL ASSOCIATION, Interpleador Plaintiff, -against- BARCLAYS BANK PLC and MORGAN STANLEY CAPITAL SERVICES, INC., Interpleador Defendants.

[10] See Complaint, paragraph 18.

[11] See paragraph 18 of the Complaint where the Trustee incorrectly cites the Indenture, Section 11.1(a)(i) (the "interest waterfall"). This citation should refer to the Indenture, Section 11.1(a)(ii) (the "principal waterfall").

[12] The Indenture contains the defined term Subordinated Issuer Termination Payment which is defined as "A termination payment required to be made by the Issuer to an Unfunded CDS Counterparty upon the termination of the related Unfunded Synthetic Asset (i) pursuant to an event of default or termination event (each as defined in the related Master Agreement) as to which the Unfunded CDS Counterparty was the defaulting party or an affected party under the related Master Agreement or (ii) in connection with a liquidation of the Collateral following an Event of Default if at such time the Unfunded CDS Counterparty was the defaulting party or an affected party under the related Master Agreement." According to Section 11.1(a)(ii)(14), this amount is payable to MSCS at step 14 of the principal waterfall.

[13] See Indenture, Section 11.1(a)(ii)(14).

HIGHLY CONFIDENTIAL

derivatives and my extensive interactions with investors, Rating Agencies, and derivative counterparties. More generally, I am familiar with collateral posting procedures between derivative counterparties from my experience working at both "buy side" and "sell side" firms active in the derivatives markets.

### Part III-A: The ability to demand collateral

When one party to a derivative transaction is a CDO with rated notes, the CDO must mitigate its exposure to its counterparty in order to achieve the highest possible ratings on the CDO notes. In derivative transactions the term "counterparty risk" refers to the possibility that the party on one side fails to perform its contractual obligations and thus causes economic loss to the other party. One type of counterparty risk is the risk of non-payment. To mitigate the risk of non-payment, a hybrid ABS CDO could typically demand collateral from a CDS counterparty for two different types of exposure:

1.  CDS Premium. The CDS premium is a primary source of cashflow for a hybrid ABS CDO. A typical collateral provision would permit the CDO to demand up to one or two months' premium payment to mitigate the risk that a counterparty's liquidity difficulties would interrupt premium cashflow.

2.  Reimbursement Amounts. Under the Pay-as-You-Go CDS contracts typical in hybrid ABS CDOs, a counterparty as buyer of protection can be obligated to reimburse the CDO for prior payments that the CDO has made to the counterparty with respect to a reference obligation that subsequently recovers (such amounts "Reimbursement Amounts").[14] Typically, under certain situations, the CDO may demand that the CDS counterparty post as collateral the same amounts that the CDO has paid to the CDS counterparty in case those amounts ever need to be repaid to the CDO as Reimbursement Amounts. In other words, in these situations, each time a CDO makes a payment to the CDS counterparty, it may demand that the counterparty post a equivalent and corresponding amount back to the CDO in the form of collateral.

These provisions address a counterparty's ability to pay as required under the derivative contract, so it is common to tie these provisions to a counterparty's credit rating which is a proxy for its ability to meet its financial obligations. As counterparty ratings decline, a counterparty is considered to be more risky, and therefore the collateral demands made to the counterparty typically become more onerous.

Through the ISDA CSA mechanism, collateral posting has become routine and standardized. In the normal course, the party that will be secured by collateral will send a demand to the party required to secure its position. The party posting collateral is known as the "Pledgor" and the

---

[14] Generally these reimbursements would be the consequence of an improvement in credit quality of a reference obligation after a protection payment has been made. For example, it is possible that a reference obligation experiences an Implied Writedown due to deteriorating credit quality which subsequently reverses itself due to improvement in credit quality.

HIGHLY CONFIDENTIAL

party receiving the collateral is known as the "Secured Party." The Pledgor will post collateral in an amount and type satisfactory (based on the terms outlined in the CSA) or contest all or part of the demand. In instances where the Pledgor contests part of the collateral demand from the Secured Party, the Pledgor will post collateral in an amount sufficient to satisfy the non-contested demand. There are dispute resolution procedures built into the CSA which address these issues when they arise; however, in my experience, the parties to the agreement usually work out a resolution without resorting to formal procedures. In my experience, the posting of collateral upon demand is not a substantial burden, generally, and is part of the normal course of business for institutions engaged in derivative trading. Institutions like MSCS and Barclays enter into thousands of derivative contracts with hundreds of counterparties, many of which involve frequent collateral posting.

**Application to Tourmaline**

My review of the Tourmaline documentation indicates that Tourmaline's right to demand collateral from MSCS is consistent with my expectations based on industry custom and practice as described above.[15] Since MSCS is the "buyer of protection" under the CDS Agreement, Tourmaline has very limited exposure to MSCS compared to the considerable exposure MSCS has to Tourmaline as "seller of protection." Despite this lopsided risk exposure, under the terms of the CDS Agreement, MSCS agreed to give Tourmaline the right to demand collateral from MSCS. As I would expect based on my experience, the exact calculation formula that defines the amount of collateral Tourmaline can demand from MSCS references premium amounts and reimbursement amounts and can vary based on the short-term and long-term ratings of Morgan Stanley. Under the CDS Agreement, Tourmaline does not collateralize MSCS's substantial exposure to it; however, MSCS can rely upon its status as a secured party under the Indenture for payment, subject to the subordination provisions of the waterfall.[16]

Long-term and short-term ratings of Morgan Stanley (as "Credit Support Provider" to MSCS under the CDS Agreement[17]) can play a role in determining the amount of collateral Tourmaline could demand from MSCS.[18] The following table outlines these potential collateral demands as set forth in the CSA.[19]

---

[15] The language in Tourmaline's CDS Agreement mirrors my expectation of "normal course" behavior. See CSA, Paragraphs 3 and 4 where the phrase "upon a demand" occurs repeatedly. Typically either Party A or Party B can be the Pledgor or the Secured Party; however, in the Tourmaline CSA, Paragraph 13(n) the parties agreed that only MSCS would be the Pledgor and only Tourmaline the Secured Party.

[16] The definition of Secured Parties in the Indenture includes each Unfunded CDS Counterparty.

[17] See Schedule, Part 4(k)(i).

[18] An explanatory note on the ratings is in order. For S&P, the relevant long-term rating is the "Long-Term, Local Issuer Credit Rating" with a high of AAA, and the relevant short-term ratings is the "Short-Term Local Issuer Credit Rating" which ranges from a top rating of A-1+ to below A-3. For Moody's, the relevant long-term rating is the "Senior Unsecured Debt Rating" with a high of Aaa, and the relevant short-term rating is simply the "Short Term Rating" which ranges from a high of P-1 to below P-3. Note Moody's does not have a P-1+ rating equivalent to S&P's A-1+. Furthermore, "A-3" designates a short-term rating from S&P whereas A3 represents the lowest long-term single-A rating from Moody's. To minimize confusion, in this report all references to short-term ratings will

HIGHLY CONFIDENTIAL

Table 1

| Ratings Tier | Potential Collateral Demand | Rating Condition | | |
|---|---|---|---|---|
| I. | (A) Reimbursement Amounts | Short-term and at or above A-1 and P-1 | | Long-term <u>at or above</u> the rating of the most senior class of Tourmaline rated notes, by each Rating Agency |
| II. | (A) Reimbursement Amounts *plus* <br> (B) <u>One</u> future CDS Premium Installment | Short-term and at or above A-1 and P-1 | | Long-term <u>below</u> the rating of the most senior class of Tourmaline rated notes, by each Rating Agency |
| III. | (A) Reimbursement Amounts plus <br> (B) <u>Two</u> future CDS premium installments | Short-term below A-1 <u>but not</u> below A-2 | or <br><br> or | below P-1 <br><br> below P-2 |
| IV. | (A) Reimbursement Amounts *plus* <br> (B) <u>Two</u> future CDS premium installments *plus* <br> (C) "Mark-to-Market"[20] | Short-term below A-2 | or | below P-2 |

Table 1 describes a multiple tiered structure for collateral posting, determined based on the rating of the counterparty. Downgrades or upgrades in the counterparty rating could change the calculations of the amount of collateral Tourmaline could rightfully demand at any point in time. Note that <u>in all cases</u> Tourmaline can demand posting of potential Reimbursement Amounts, regardless of Morgan Stanley's rating.

Table 2 below sets forth the relevant ratings history of Morgan Stanley and the amount of collateral Tourmaline could demand from MSCS from the closing of the transaction in September 29, 2005 through January 9, 2009 (*i.e.*, the date on which the Trustee sent a notice to MSCS purporting to declare an ATE)[21]:

---

separate the letter from the number with a hyphen (*e.g.* "P-1" instead of P1) despite the fact that practice varies on this point in the relevant Tourmaline documentation.
[19] See the CSA, Paragraph 13 (b)(iv)(A)(1) and Paragraph 13 (b)(iv)(A)(2).
[20] See the CSA Paragraph 13 (b)(iv)(C), definition of Exposure with respect to MSCS.
[21] Morgan Stanley ratings data provided by Bloomberg Finance L.P., December, 12, 2009.

**HIGHLY CONFIDENTIAL**

**Table 2**

| Date | S&P | | Moody's | | Rating of Most Senior Class of Rated Notes[22] | | Potential Collateral Demand[23] |
|------|-----|---|---------|---|------|------|------|
| | Short-Term | Long-Term | Short-Term | Long-Term | S&P | Moody's | See Table 1 |
| 9/29/05 | A-1 | A+ | P-1 | Aa3 | AAA | Aaa[24] | Ratings Tier II |
| 7/30/07 | A-1+ | AA | P-1 | Aa3 | AAA | Aaa | Ratings Tier II |
| 12/19/07 | A-1+ | AA *- | P-1 | Aa3 | AAA | Aaa | Ratings Tier II |
| 4/1/08 | A-1+ | AA- | P-1 | Aa3 | AAA | Aaa | Ratings Tier II |
| 4/2/08 | A-1+ | AA- | P-1 | Aa3 | AAA | Aaa *- | Ratings Tier II |
| 4/15/08 | A-1+ | AA- | P-1 | Aa3 | AAA | Aa2 *- | Ratings Tier II |
| 6/2/08 | A-1 | A+ | P-1 | Aa3 | AAA | Aa2 *- | Ratings Tier II |
| 6/27/08 | A-1 | A+ | P-1 | Aa3 *- | AAA | Aa2 *- | Ratings Tier II |
| 7/30/08 | A-1 | A+ | P-1 | Aa3 *- | AAA | Ba1 *- | Ratings Tier II |
| 8/11/08 | A-1 | A+ | P-1 | A1 | AAA | Ba1 *- | Ratings Tier II |
| 9/05/08 | A-1 | A+ | P-1 | A1 | AAA *- | Ba1 *- | Ratings Tier II |
| 10/09/08 | A-1 | A+ | P-1 | A1 | AA | Ba1 *- | Ratings Tier II |
| 10/10/08 | A-1 | A+ | P-1 | A1 *- | AA | Ba1 *- | Ratings Tier II |
| 12/17/08 | A-1 | A+ | P-1 | A2 | AA | B1 *- | Ratings Tier II |
| 12/19/08 | A-1 | A | P-1 | A2 | AA | B1 *- | Ratings Tier II |
| 1/09/09 | A-1 | A | P-1 | A2 | AA | B1 *- | Ratings Tier II |
| Note: | The suffix [*-] indicates that a rating is on watch for downgrade. | | | | | | |
| | [    ] Shaded areas represent a ratings action. | | | | | | |

[22] The relevant class is the Tourmaline Class I notes.  Ratings information obtained directly from Moody's and S&P.
[23] For potential collateral demands, see the CSA Paragraph 13 (b)(iv)(A) and Paragraph 13(b)(iv)(B).
[24] Moody's did not rate the Class I Notes until October 20, 2005.  Moody's rating on the Class II Notes, however, on September 29, 2005 was Aaa.

HIGHLY CONFIDENTIAL

It should be noted that, at all times since Tourmaline's closing, Tourmaline's ability to demand collateral and the calculation of the amount of collateral it could have demanded have not changed. Although there have been numerous ratings actions affecting Morgan Stanley's ratings and the ratings of the most senior class of Tourmaline rated notes by S&P and Moody's since closing (as indicated in the shaded areas in Table 2), none of these ratings actions has changed Tourmaline's ability to demand one future premium installment and all Reimbursement Amounts. At all pertinent times, Morgan Stanley's rating was at least A-1 and P-1, and Morgan Stanley's long-term S&P rating was always lower than the S&P rating of the most senior class of Tourmaline rated notes.[25]

### Part III – B: Importance of the demand notice

Central to this ordinary collateral procedure is that posting is "upon demand." This requirement for a demand is a common concept in ISDA documentation where notices, demands, and cure periods are routinely required to avoid a situation where administrative errors or misunderstandings might lead to defaults or termination events before the parties have an opportunity to fix the problem. In my opinion, these provisions promote smooth operations for counterparties wishing to standardize their derivatives as much as possible and are consistent with stated ISDA objectives. According to the ISDA Mission Statement:

"The Association's primary purpose is to encourage the prudent and efficient development of the privately negotiated derivatives business by:

- Promoting practices conducive to the efficient conduct of the business, including the development and maintenance of derivatives documentation.
- Promoting the development of sound risk management practices.
- Fostering high standards of commercial conduct."[26]

In my experience with ISDA documentation and CDOs, traps for the unwary are avoided in favor of clear signposts to all involved. The requirement for notices and demands, cure periods, and the ability to contest calculation of amounts all serve to protect against the possibility of administrative error, misinformation, or disputes arising from any inadvertent failure to perform.

---

[25] I am aware that Barclays has stated that Morgan Stanley failed to give notice as set forth in Part 5(s)(ii)(B) of the Schedule. According to this provision, MSCS must give notice to Tourmaline if there is a downgrade in Morgan Stanley's rating that will change the amount of collateral required to be posted under the CSA. Certain ratings downgrades could have this affect; others could not. Based upon my review of Morgan Stanley's rating history and the potential collateral demands, as shown above in Table 2, no downgrades occurred which could have caused a change of Morgan Stanley's collateral posting requirements at any time between the closing of Tourmaline in September 2005 and the delivery to MSCS of the purported ATE notice from the Trustee on behalf of Tourmaline on January 9, 2009. In other words, no downgrade occurred during the relevant period that affected the amount of collateral that could be demanded from MSCS.

[26] First three of six objectives shown here. As of November 16, 2009. See www.isda.org

**HIGHLY CONFIDENTIAL**

In my experience, CDS transactions, as negotiated contracts, are open to negotiation and customization by the parties involved such that certain standard provisions, including those related to demands and notices, can be modified if the parties choose to do so. When structuring CDOs and procuring ratings from the Rating Agencies, I have had rating analysts ask that certain notices that are similar to collateral demand notices be "deemed to have been given" by the CDO, even if the CDO did not actually send the notice. In all instances that I can recall, I insisted on actual notice because I believed that the deemed notice would remove the control process embedded in the ISDA documentation, and by so doing would expose my organization to the risk that administrative error or mutual mistake or misunderstanding could inadvertently lead to a termination event and an unwind of the transaction at an inopportune time. It is much safer to retain requirements for parties to give notice to one another so that everyone understands the current state of a transaction and can notice and correct errors when they arise.

Based upon my experience as a practitioner in rejecting the "deemed demand" concept, I would expect any such agreement to eliminate required notices to be a highly negotiated point. In my experience, given the significance and potential impact of a non-standard provision of any type of deemed notice, I would expect that the parties would endeavor to document any non-standard provisions in the relevant swap documentation in direct and non-ambiguous language. In preparing this expert report, I have reviewed the CSAs for two other ABS CDO transactions, Pampelonne II CDO ("Pampelonne II") and Tourmaline II CDO ("Tourmaline II") to which Barclays was a CDS counterparty in a role similar to the role of MSCS in Tourmaline. In Paragraph 11 of the Tourmaline II CSA, there is a provision which states that "[Tourmaline II] shall *be deemed to have made the demand* required of the Transferee under Paragraph 2(a) on any Valuation Date on which the Credit Support Amount exceeds the Value of the Transferor's Credit Support Balance."[27] Pampelonne II's CSA modifies the "upon demand" language through an amendment to the Paragraph 2(a) language to delete the phrase "upon demand by the Transferee."[28] In both of these agreements, the parties decided to expressly eliminate the requirement that the CDO must demand collateral before the counterparty is required to post it. These modifications are precisely the type of direct and non-ambiguous language I would expect to see used when parties wished to alter the standard procedures relating to collateral demands.

In my experience, if parties do not agree to waive demand or notice provisions in a derivative transaction facing a CDO, they often identify the party responsible for giving demands and notices on behalf of the CDO. Since a CDO has no employees of its own, it contracts with other parties to provide services to it such as asset management, accounting, reporting, and other functions. Frequently in my experience, one of those service providers assumes (implicitly or explicitly) duties of this type. Most commonly, the manager or the trustee would perform such duties on behalf of the CDO. In fact, I have closed CDO transactions with numerous trustees,

---

[27] Emphasis added. See Tourmaline II CSA, Paragraph 11 (h)(ii). Note that some of the terms used in Tourmaline II differ from Tourmaline because Tourmaline II is an English law CSA and Tourmaline's CSA was governed by New York law.

[28] See Pampelonne II CSA, Paragraph 11(h)(B).

HIGHLY CONFIDENTIAL

and I understood that trustees assessed all of their duties and created records in their systems to track performance of those duties. Similarly, since the trustee controls cash inflows and outflows for the CDO, the trustee is in a good position to assess possible counterparty exposure to the CDO. For these reasons the trustee is capable of performing, and often accepts responsibility for, these duties.

In my experience working with derivative transactions and CDOs, normal operating procedure would typically dictate that someone authorized to represent the CDO (most likely either the Trustee or the Collateral Manager) would notify the counterparty that collateral was due under the CSA. Typically this notice would be between two relatively junior level employees at the two organizations who were assigned to monitor the transactions. In the case of a dispute, the two parties would attempt to "tie out" their calculations to determine where there were calculation differences.[29] Although it could take some time for the dispute to be resolved, normal course behavior would dictate open communication between the parties to achieve the desired outcome.

**Relevance to Tourmaline**

In my review of the Tourmaline transaction documents, I did not observe language waiving collateral demand requirements like the express waivers I saw in Barclays' Tourmaline II and Pampelonne II deals or in any other manner. The lack of direct and non-ambiguous language like that found in these other Barclays deals leads me to conclude that the parties did not agree to waive the standard demand provision of the CSA and, as a consequence of the "upon demand" language contained in the Tourmaline CDS Agreement, the Tourmaline CDS Agreement follows the custom and practice in the industry that a demand must precede a counterparty's requirement to post collateral. As further support for my opinion, I note that the Tourmaline Indenture contains a requirement that the Trustee make any demands to MSCS for collateral on behalf of Tourmaline. The Indenture Section 12.6(f)(v) states: "The Trustee, on behalf of the Issuer, shall make a prompt demand upon . . . any Synthetic Asset Counterparty or its guarantor, if any, in the event credit support is required to be posted by the Synthetic Asset Counterparty or its guarantor . . . ." The assignment of the demand obligation to the Trustee further evidences the contemplation that the Tourmaline CDS agreement follows the custom and practice of the industry inasmuch as a demand to MSCS must occur before MSCS is obligated to post collateral.[30]

## Part IV:  Credit ratings downgrade triggers affecting CDS counterparty obligations

I have been asked to give an expert opinion on general industry custom and practice regarding the presence, structure, and consequences of downgrade triggers in CDS agreements between a CDS counterparty and a CDO and to apply such custom and practice to the specific facts and circumstances surrounding Tourmaline as I understand them. In my experience the downgrade trigger provisions in CDS Agreements are included to satisfy rating agency requirements to de-

---

[29] See as an example in Tourmaline, CSA, Paragraph 5 "Dispute Resolution."

[30] In other transactions I have worked on I have seen similar arrangements where the CDO manager has assumed responsibilities of this nature.

HIGHLY CONFIDENTIAL

link the CDO ratings from the rating of the CDS Counterparty.  The Rating Agencies have issued policies and guidelines with respect to derivative counterparties in a number of publications which I reviewed for this report.[31]  Furthermore, in my experience as a CDO banker, I have negotiated with the Rating Agencies on many occasions with respect to these issues.

In my experience there is always a two-tier structure to downgrade triggers in CDS agreements with CDOs.  The tiers are based on the ratings of the counterparty (both short-term and long-term).  If a counterparty's credit rating deteriorates to the first tier, the counterparty has several options to provide credit enhancement including collateralization.  After further deterioration to the second tier, the counterparty is allowed fewer options, and collateral alone may not mitigate the increased counterparty exposure.

The counterparty rating triggers make it possible to achieve ratings on the highest rated notes of the CDO (usually AAA/Aaa at issuance).[32]  The Rating Agencies require the two-tiered approach to provide additional credit support to mitigate counterparty risk upon a counterparty's downgrade.  The collateral gives the Rating Agencies comfort that should the counterparty fail to perform its obligations, the CDO will be able to seize the collateral and use the proceeds to service the principal and interest on its rated debt.  If the ratings of the counterparty or its guarantor decline so far that they trip the second threshold, the Rating Agencies require the counterparty to find (and pay for) a suitable replacement counterparty or a sufficiently rated guarantor.   In either case the desired outcome is to have a performing counterparty.

In my experience in structuring and reviewing derivative transactions with CDOs, the consequence of a counterparty failing to satisfy the requirements upon downgrade is that the CDO assumes the option to terminate the derivative transaction by declaring an Additional Termination Event ("ATE") where the counterparty is the sole Affected Party.

**Application to Tourmaline**

Consistent with my understanding of custom and practice regarding ratings triggers in derivative contracts facing a CDO, the Tourmaline Schedule makes reference to Morgan Stanley's ratings in the definition of certain ATEs that may apply to MSCS ("Party A").[33]   As is typical in derivative agreements where a rated CDO is a counterparty, Tourmaline assumes the

---

[31] "Moody's Approach to Rating Collateralized Debt Obligations with Pay-As-You-Go Credit Default Swaps" (November 13, 2006), "Moody's Initial Views On The Dealer Form Of Confirmation For Pay-As-You-Go Credit Derivative Transactions" (June 21, 2005), "Impact of Swap Counterparty Risks on Global Structured Finance Transaction Moody's Revised Methodology Call for Comments" (March 24, 2005), "Revised Framework For Applying Counterparty And Supporting Party Criteria" (S&P, May 8, 2007), "CDO Spotlight: Structural Issues in CDOs with Synthetic ABS Exposure" (S&P, March 7, 2005), "CDO Spotlight: ISDA's CDS of ABS Templates Scrutinized" (S&P, December 1, 2005) and "CDO Spotlight: Counterparty Risk In Structured Finance Transactions" (S&P, March 7, 2005).

[32] There are very few AAA/Aaa derivative counterparties in existence, and most banks active in the CDO space are rated in the double A or single A categories.  Without ratings triggers, the ceiling for the highest rated notes would usually be the rating of the counterparty.

[33] See Schedule, Part 1 (f)(1) and Schedule, Part 1 (f)(2).

HIGHLY CONFIDENTIAL

option (but not the obligation) to declare an ATE if Morgan Stanley's ratings decline below certain thresholds and MSCS refuses to mitigate this additional credit risk by satisfying certain requirements. If ratings downgrades are moderate (tripping Level One), MSCS has the option to remain as counterparty, including through satisfaction of any collateral demands by Tourmaline. If ratings downgrades become more severe (tripping Level Two), MSCS is required to do more than satisfy collateral demands.

The following table illustrates the familiar structure of the thresholds and certain requirements as set forth in the Tourmaline I CDS Agreement[34]:

**Table 3**

| Ratings Threshold | S&P | Moody's | Requirements |
|---|---|---|---|
| Level One | Short-term falls below A-1 + | Short-term falls below P-1 (or at P-2 on watch for downgrade) OR Long-term falls below A1 (or is at A1 on watch for downgrade) | Collateralize as per the CSA OR Find a guarantor OR Find a replacement |
| Level Two | Short-term falls below A-3 OR Long-term falls below BBB- | Short-term falls below P-2 (or is P-2 on watch for downgrade) OR Long-term falls below A3 (or is A3 on watch for downgrade) | Find a replacement OR Find a guarantor (Moody's only) |

Based on the ratings in Table 2, and the definitions of thresholds in Table 3, above, MSCS has never tripped Level Two and immediately tripped Level One as of the closing date (when its S&P short-term rating was A-1). When S&P upgraded Morgan Stanley's short-term rating to A-1+ on July 30, 2007, Level One was no longer tripped until S&P reduced Morgan Stanley's short-term rating back to A-1 on June 2, 2008. When Moody's put Morgan Stanley's long-term rating of A1 on watch for downgrade on October 10, 2008, Level One was also tripped.[35] At none of these dates did Tourmaline's rights to demand collateral change, however, since the CSA already gave Tourmaline the right to demand one premium installment plus all potential Reimbursement Amounts (see Table 2). Instead, these threshold trips allowed Tourmaline to declare an ATE

---

[34] See Schedule, Part 1 (f)(2) and Schedule Part 5 (s)(ii).

[35] Though the concept of "re-tripping" a threshold that is already tripped is odd, in most instances one Rating Agency will not rely upon the rating of another. Thus, from Moody's perspective, the Level One trigger had not been tripped prior to October 10, 2008, despite the fact that it had been tripped with respect to S&P's rating.

HIGHLY CONFIDENTIAL

unless MSCS posted collateral in accordance with the CSA or found a guarantor or replaced itself.

I understand that Barclays has asserted a position that Morgan Stanley was required to satisfy multiple requirements upon tripping Level One and that simply posting collateral in accordance with the CSA was insufficient to avoid an ATE. This interpretation is inconsistent with my experience related to ratings-based ATE thresholds where at the first level an ATE cannot be declared upon a counterparty who is in compliance with collateral posting demands under the CSA. I reviewed the Tourmaline transactional documents to determine whether the requirements related to collateral posting upon downgrade are consistent with my expectations of industry custom and practice. Based on my review, it is my opinion that Tourmaline is consistent with other transactions of this type such that after tripping Level One, MSCS has the option of any of three acts:

1. Post collateral in accordance with the CSA; OR

2. Find a suitable guarantor; OR

3. Find a suitable replacement for itself.

### Part V: Ability of CDS counterparty to cure certain additional termination events

I have been asked to give an opinion on industry custom and practice regarding the ability to "cure" an ATE prior to the declaration of an ATE and to apply this practice to the facts and circumstances of Tourmaline as I understand them. I base my opinion on my experience structuring ABS CDOs and my view of counterparty and other risks related to termination of a CDS agreement in a hybrid ABS CDO.

According to standard ISDA documentation, the events giving rise to an ATE must be "then continuing" when a party gives notice to the Affected Party of an ATE[36]. This requirement provides a window for the potential Affected Party to eliminate the conditions giving rise to an ATE. In the context of the ratings downgrade trigger ATE, the counterparty has the option to comply with collateral demands, find a guarantor, or replace itself until it receives a notice of an ATE from the CDO. By refraining from sending a notice of ATE to a potential Affected Party, a CDO is granting a window to its counterparty to remove the conditions that gave rise to the potential ATE. If the counterparty chooses at any point to meet the requirement, regardless of the point in time, the CDO's exposure to the counterparty is mitigated. If the counterparty chooses to meet the requirement before an ATE is declared by the CDO, the conditions leading to a potential ATE disappear and the CDO no longer has the ability to declare an ATE.

Based upon my experience, Rating Agency criteria are designed to ensure that there is a suitable, performing counterparty in place whenever possible, not to give the CDO an unlimited option to replace a performing counterparty *ad infinitum*. Since the term of most CDO

---

[36] See ISDA Master, Part 6(b)(iv).

HIGHLY CONFIDENTIAL

transactions ranges between 35 and 40 years, the ability of the CDO to declare an ATE at any time despite the counterparty's performance would create undesirable situations.

Consider situations that could occur if the CDO held this option:

1.  The counterparty is upgraded to the highest ratings or finds a guarantor with the highest ratings but could still be terminated at any time and replaced with a counterparty with lower ratings.
2.  The counterparty would not be able to replace itself at some point in the future, since any potential replacement counterparty would shy away from a CDS transaction where an "incurable" ATE had occurred.  In this instance the CDO would remain facing the lower rated Counterparty instead of a more desirable replacement.
3.  The CDO would be able to hold the counterparty hostage using the threat of termination as its negotiating tool.

Although the ability of the CDO to terminate the CDS Agreement and subordinate any counterparty termination payments may appear to benefit the CDO noteholders, doing so is not without risk. For a hybrid transaction, termination of a counterparty could materially alter the risk profile in the collateral pool in a way that is not mitigated by the subordination of the counterparty with respect to any termination payments. As a CDO structurer, I have had to respond to the Rating Agencies' concerns that after the termination of a CDS counterparty, the remaining collateral pool would be materially more risky than before termination. Because of these conversations, I know that the Rating Agencies prefer to have a performing counterparty rather than a terminated one.

**Application to Tourmaline**

I understand that Barclays takes the position that MSCS permanently lost the ability to eliminate the conditions allegedly giving rise to a potential ATE by failing to take action within the time periods that were built into the ratings downgrade trigger.  For example, I understand Barclays' position to be that if MSCS failed to post collateral in accordance with the CSA within 30 days of the relevant S&P downgrade but did post on day 31 that it would have been permanently subject to termination of the CDS agreement upon the basis of an incurable ATE. I understand Barclays' witnesses to have testified that this situation would provide Barclays with an indefinite option to direct the Trustee to terminate MSCS's CDS agreement for years or decades, even if MSCS is then compliant with any collateral posting obligations.

In my experience it is true that after tripping the level one threshold, a counterparty typically has a defined period of time to meet one of the three requirements before the CDO has the option to declare an ATE, as is the case in Tourmaline[37].  But the defined number of days does not define a period after which the conditions giving rise to an ATE cannot be cured, but rather defines the period before which there is no ATE.  This defined period is recognition by the

---

[37] In Tourmaline, the time periods are as follows:  (A) with respect to S&P, 30 days at Level One and 10 days at Level Two and (B) with respect to Moody's 5 days for collateral posting and 20 days for other requirements irrespective of the level. See Schedule, Part I (f)(2).

HIGHLY CONFIDENTIAL

relevant Rating Agency that the counterparty is unlikely to fail in its payment obligations over such a short period (it does, after all, still have reasonably high ratings at both thresholds) and gives the counterparty time to get its affairs in order and decide which of the three options it chooses to meet. Once the defined period has passed, if the counterparty has not met one of the three requirements to mitigate its counterparty exposure, the CDO can declare an ATE. But if MSCS posted collateral before the end of the defined period or before the ATE declaration, there is no economic or risk management reason to support an ATE because the counterparty is now performing. In my opinion the ATE would no longer be continuing and consequently there would be no basis for terminating the CDS agreement.

**Further Opinions**

The explanation of my opinions contained in this report is based upon the information available to me at this time. If I become aware of facts, evidence, and/or other information not available to me at this time, I reserve the right to supplement and/or revise my report and revise my conclusions if warranted. I also reserve the right to supplement this report to take into account any testimony or opinions offered by any other expert in this case.


Dated: December 14, 2009

By: _____

John E. Costango

# Exhibit A

Expert Report of John E. Costango
Exhibit A

1325 Avenue of the Americas, 28th Floor, New York, NY 10019 / +1.212.792-5275 / jcostango@greensledgegroup.com

# John Costango / The GreensLedge Group LLC

**Current**   The GreensLedge Group LLC ("GreensLedge") is a structured credit financial advisory firm focused on merchant banking, fund placement, and litigation support. Professionals at GreensLedge serve as consultative experts and testifying experts for litigations and bankruptcies related to our core expertise of structured finance markets. We provide the requisite business knowledge and market context to assure that counsel can consider all relevant aspects of a case including economics, market practice, and deal structural features when devising trial strategy, planning and conducting discovery, as well as preparing for depositions and cross-examinations.

**Prior**         **February 2007 – March 2009      J.P. Morgan Securities Inc.        New York, NY**
**Experience**
Executive Director

- Banker responsible for origination and structuring of high-grade and mezzanine CDOs backed by ABS and derivatives referencing ABS bonds.
- During the fall of 2007 led JPMorgan's structuring effort on the Master Liquidity Enhancement Conduit ("M-LEC"), a private response to the collapse of the SIV market, arranged by the US Treasury, which established the conceptual framework for much of the subsequent government interventions such as PPIP and TALF.
- Senior banker on the Maiden Lane LLC transaction, the $30 B vehicle funded by the New York Federal Reserve Bank and JPMorgan to support JPMorgan's acquisition of the Bear Stearns Companies, Inc.
- Coordinated the liquidation of a large and diverse collateral pool held as security for a bankrupt counterparty's obligations and consulted with JPMorgan's bankruptcy counsel on the process.
- Served as the main point of contact for disputes and litigations related to CDOs and CDO warehouses for Bear Stearns and JPMorgan legacy CDO businesses.

**February 2004 – February 2007      Citigroup Global Markets Inc.        New York, NY**

Director

- Banker responsible for origination and structuring of high-grade and mezzanine CDOs backed by ABS, CMBS, commercial real estate loans, and derivatives referencing bonds of such asset types.
- Developed dynamic structure for "hybrid" ABS CDOs which allowed for reallocation of cash and derivative assets over time.
- Prepared legal documents such as indentures, offering memoranda, swap agreements, and loan agreements with outside counsel.
- Responsible for all aspects of the analytics and the rating agency process.
- Coordinated with the CDO syndicate and sales team to prepare marketing materials, led investor meetings, and responded to investor requests about transaction structure and economics.
- Coordinated deal closing procedures and post-closing matters with the asset manager, trustee, and trading desks.

**May 2001 – January 2004            ACE Capital Re Inc.                   New York, NY**
                                   ( now Assured Guaranty)

Vice President

- Analyzed equity investments in a $100 MM portfolio of cash investment grade corporate CDOs.
- Structured mortgage reinsurance products for prime and subprime mortgage pools.
- Underwrote early versions of CDS on ABS that eventually developed into the standard Pay-as-You-Go contract.

*Prior experience as an actuarial consultant and high school mathematics teacher*

**Education**    **September 1989 – May 1993      Dickinson College                  Carlisle, PA**

BA, *summa cum laude*, majors in Mathematics and English Literature with a minor in Education

**Registration**  Series 7 and 63

# Exhibit B

Expert Report of John E. Costango
Exhibit B

**Complaint & Answers**

- Interpleader Complaint of U.S. Bank, National Association as Successor to Wachovia Bank, National Association against Barclays Bank PLC and Morgan Stanley Capital Services, Inc., , January 16, 2009
- Interpleader defendant Barclays Bank PLC's Answer, Affirmative Defenses, and Statement Supporting Barclays' Claims for Relief, including accompanying exhibits, March 2, 2009
- Interpleader defendant Morgan Stanley Capital Services Inc.'s Answer, Affirmative Defenses, and Statement Supporting its Claims for Relief, March 20, 2009

**Tourmaline Documents**

- Indenture between Tourmaline and the Trustee
- Collateral Administration Agreement between Tourmaline and the Trustee
- Collateral Management Agreement between Tourmaline and BlackRock
- Final Offering Memorandum of the Issuer with respect to its Offered Notes
- Agreements related to the Unfunded Synthetic Assets
    - ISDA Master, Schedule, Confirmations (for ABS and CDOs) & CSA between MSCS and Tourmaline
    - Guarantee of MSCS's obligations with respect to the Unfunded Synthetic Assets by Morgan Stanley
- Agreements related to the Funded Synthetic Assets
    - ISDA Master, Schedule, Confirmation & CSA between MSCS and Tourmaline
    - Guarantee of MSCS's obligations with respect to the Funded Synthetic Assets by Morgan Stanley
- Liquidity Facility Agreement between Barclays and Tourmaline

**Deposition transcripts and exhibits**

- Scrivens (November 4, 2009 and November 5, 2009)
- Jones (November 12, 2009)
- King (November, 16, 2009)
- Burrell (November 18, 2009)
- Jean, (November 19, 2009)
- Kott (November 19, 2009)
- McKenna (November 20, 2009)
- Chaku (November 24, 2009)
- Yeung (November 24, 2009)
- Hosford (December 1, 2009 and December 2, 2009)
- Horowitz (December 4, 2009)
- Coleman-Simmons (December 8, 2009)
- D'Antonio (December 9, 2009)

Expert Report of John E. Costango
Exhibit B

**Rating Agency Publications**

- Moody's
    - o "Moody's Approach to Rating Collateralized Debt Obligations with Pay-As-You-Go Credit Default Swaps" (November 13, 2006)
    - o "Moody's Initial Views On The Dealer Form Of Confirmation For Pay-As-You-Go Credit Derivative Transactions" (June 21, 2005)
    - o "Impact of Swap Counterparty Risks on Global Structured Finance Transaction Moody's Revised Methodology Call for Comments" (March 24, 2005)
- S&P
    - o "Revised Framework For Applying Counterparty And Supporting Party Criteria" (May 8, 2007)
    - o "CDO Spotlight: Structural Issues in CDOs with Synthetic ABS Exposure" (March 7, 2005)
    - o "CDO Spotlight: ISDA's CDS of ABS Templates Scrutinized" (December 1, 2005)
    - o "CDO Spotlight: Counterparty Risk In Structured Finance Transactions" (March 7, 2005)